UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HYTERA COMMUNICATIONS CORPORATION LTD., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 19-cv-176 |
| v. | ) ) | Hon. Steven C. Seeger |
| MOTOROLA SOLUTIONS, INC., | ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

Embattled competitors in the digital two-way radio market meet again in this case, one in a long string of contentious cases. Motorola and Hytera both manufacture digital two-way radios, and they both provide accompanying service and maintenance functions for their two-way radio customers.

The parties have been sparring and jousting for years, across multiple jurisdictions. They faced off at the International Trade Commission; in another case right here in the Northern District of Illinois; and across the globe, including in Germany and Australia. Motorola filed complaints against Hytera in each of those jurisdictions, arguing that Hytera infringed its patents for key elements of its digital two-way radios and that it stole trade secrets. *See Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, No. 17-cv-1972 (N.D. Ill. Mar. 14, 2017) (Blakey, J.); *Motorola Sols., Inc., et al. v. Hytera Commc'ns Corp.*, No. 17-cv-1973 (N.D. Ill. Mar. 14, 2017) (Norgle, J.); *Certain Two-Way Radio Equipment & Sys., Related Software & Components Thereof*, No. 337-TA-1053 (ITC Mar. 29, 2017).

But in this case, Hytera flips the script.[1]  Now Hytera is on offense, alleging that Motorola's behavior violated federal and state antitrust laws.  And, as Hytera sees it, this anticompetitive behavior has contributed to Motorola's dominance in the market in the United States.

Motorola moved to dismiss.  For the reasons explained below, the motion is denied in part, and granted in part.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint.  *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020).  The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint."  *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Both Hytera and Motorola are in the business of selling digital two-way radios, also known as "Land-Mobile Radio" or "LMR systems."  *See* Am. Cplt., at ¶¶ 31–35, 43 (Dckt. No. 45).  Industries with a need for instant communication – like local and state police, fire departments, and emergency medical services – rely on these LMR systems for their critical, time-sensitive communications.  *Id.* at ¶ 42.  And the LMR systems are well-suited for emergency use:  they require the push of only a single button to "instantaneously talk to one or broadcast to many over a dedicated communications network."  *Id.* at ¶ 43.  The benefits are easy to see.  There is "no fumbling to dial numbers, no need to conference in multiple numbers, no waiting for the personal on the other end to answer, and no dropped calls."  *Id.*

---

[1]  Plaintiffs include multiple Hytera legal entities, as well as PowerTrunk.  To make the opinion easier to read, the Court will refer to Plaintiffs collectively as "Hytera."

LMR systems have other advantages, too. The radios provide "digital clarity, reduced radio interference, and ruggedness." *Id.* at ¶ 44. Plus, the networks protect user privacy. The radio communications "are not broadcast over public channels, but over a private radio network using spectrum licensed from the FCC for that purpose." *Id.* Touting all of these advantages, it's no surprise that the LMR market is highly valued. Hytera estimates that the LMR market value in 2015 was between $4.5 billion and $5 billion dollars. *Id.* at ¶ 45.

## I.      The LMR Market Landscape

Hytera devotes significant real estate in its complaint to the technology behind the LMR systems. *Id.* at ¶¶ 53–79. At this stage, however, a few key points about the different types of technology are particularly salient to understanding Hytera's claims.

### A.      The Technologies

There are three major technologies for these LMR systems: P25, DMR, and TETRA. Each has its advantages, as described below.

Motorola's product line primarily uses P25 technology, a "digital-way radio communication standard that generally operates between 12.5 kHz and 6.25 kHz bandwidth." *Id.* at ¶¶ 23, 65. Motorola is one of the original developers of the P25 technology and remains the dominant supplier of P25 technology in the United States. *Id.* at ¶ 68. It currently maintains a share of over 70% of sales of new LMR terminals and systems to public safety customers. *Id.* P25 is the "overwhelmingly dominant technology standard" in the United States public safety digital two-way radio market. *Id.* at ¶ 60.

While P25 is the dominant technology used in the public safety market, a different technology dominates with business customers: DMR. *Id.* at ¶ 62. DMR is a "widely accepted standard" worldwide, and operates at 12.5 kHz bandwidth. *Id.* at ¶ 73. "The most common

DMR System is a[n] FCC-licensed system . . . aimed at the professional business and industry market, with features such as group calling and texting, which are common needs for business users." *Id.* at ¶ 75. The DMR technology is also cost-effective, which makes it an attractive option for the business and industry customer. *Id.*

Both Hytera and Motorola sell DMR in the United States, but Motorola "has dominated the sale of DMR products in the United States and currently supplies more than 80% of new DMR terminals to the market." *Id.* at ¶ 74.

Finally, there is the TETRA technology, which the FCC approved for use in the United States in 2013. *Id.* at ¶ 72. It was designed and optimized for use in high-density areas. *Id.* at ¶ 70. The primary customers of TETRA technologies are government agencies and safety organizations. *Id.* Despite its popularity in the global market, however, the technology has not gained traction in the United States. *Id.* at ¶ 60. And, as Hytera sees it, Motorola has successfully taken concerted actions to maintain the status quo and ensure that the TETRA technology remains unpopular in the United States. *See, e.g., id.* at ¶ 72.

One final note on the three LMR systems: Motorola and Hytera don't just provide their customers with a two-way radio and call it a day. Yes, they provide hardware (like handsets and accessories). But they often provide more than that. *Id.* at ¶ 87. For one, they provide systems equipment, like base stations and repeaters, which make the hardware work. And they also provide services, like integration services, management, and support services (including repair, technical support, and maintenance), as well as cybersecurity and network monitoring.

### B.     The Customers

Next, the Court turns to who buys these systems.  The largest customer segment for LMRs – "by far" – is the "mission-critical" segment.  *Id.* at ¶¶ 81–83.  So the Court starts there.  The Court will then turn to the "business-critical" customer segment.

"Mission-critical" is the industry shorthand for the public safety customers, such as first responders, government agencies, and some utility and transportation customers.  The mission-critical customer segment comprises approximately 80% of all LMRs purchased in North America.  *Id.* at ¶ 83.  Most of the mission-critical segment's customers work in public safety.  These public safety customers make up a whopping 70% of the LMR purchases in the United States, while utility and transport customers round out the other 10% of the market.  *See id.*

Mission-critical customers have very particular demands for their LMR needs.  And, even within the mission-critical segment, these needs can be diverse (depending on the customer).  *Id.* at ¶ 84.  Public safety customers, for example, focus on "reliability, longevity, scalability, and . . . interoperability among various public safety agencies."  *Id.*  They also value encryption and other protections.  *Id.*  Public safety customers need LMRs that can withstand extreme conditions, like exposure to fire or submersion in water.  *Id.*  Because of these needs, public safety customers don't often buy their LMR systems off-the-shelf.  Instead, they typically award these public-safety contracts to a supplier after a "public bidding process."  *Id.* at ¶ 85.

On the other hand, the utility and transportation customers have different demands.  They don't require some of the same advanced (and expensive) technologies that the first responders need.  But they put a premium on technology that meets regulatory requirements, and they are more cost-conscious than a public safety customer.  *Id.* at ¶ 86.  In this utility and transportation space, Hytera is "[Motorola's] closest competitor."  *Id.*

5

The other customer segment is the "[b]usiness-critical" or "operations-critical" segment. These customers comprise the remaining 20% of the LMR customers in the United States. *Id.* at ¶ 88. This segment includes construction companies and contractors; hospitality companies; private security companies; schools; and the service industry (like "delivery companies, towing companies, [and] landscaping companies"). *Id.*

Business-critical customers prioritize a "more cost-optimized LMR solution compared to the technologies typically considered by public safety customers." *Id.* at ¶ 90. They have less of a need for the "redundancy, security, and interoperability capabilities." *Id.* After all, business-critical customers do not expect to be handling large-scale emergencies on a regular basis. Rather, they are purchasing the technology for more day-to-day activities. As mentioned above, the business-critical customer segment primarily uses the DMR technology. *Id.* at ¶ 75.

## II.     Motorola's Allegedly Exclusionary Conduct

The Court has covered the technologies and the markets at issue. Now, it turns its attention to the anticompetitive issues alleged in the complaint.

Hytera alleges that Motorola has "engaged in a multi-faceted scheme to substantially foreclose competition in the United States." *Id.* at ¶ 91. It says that Motorola takes various actions to keep competitors out of the market, including exclusive dealing; tying and leveraging; a coordinated campaign of false rumors and misinformation; and sham petitioning. As a result of these actions, there is allegedly "less choice and higher costs for customers." *Id.* at ¶ 92. Plus, these actions "destroy[] competition" and "harm[] Hytera individually in the form of lost sales and profits." The Court outlines these allegations below.

A.      **Exclusive Dealing**

Hytera alleges that Motorola kicked off a new program in 2011 – called the "PartnerEmpower Program" – that sought to "entice independent dealers to resell and distribute" its products in three Motorola business segments. *Id.* at ¶ 93. This program "award[s] points to dealers based on their success in reaching metrics," in categories like revenue, training, and sales. *Id.* PartnerEmpower dealers could earn classifications like "Authorized," "Specialist," or "Elite," based on their performance across these criteria. *Id.* at ¶ 94.

Depending upon the dealer's designation, he could earn certain rewards like rebates, cash, and other financial incentives. *Id.* Unsurprisingly, the dealers who generated the most Motorola business "received the most marketing funds." *Id.* As Hytera sees it, the PartnerEmpower program "incentivize[s] dealers to only sell [Motorola] products." *Id.* at ¶ 95.

There were carrots, and there were sticks. Hytera says that Motorola's scheme threatened to punish the dealers who didn't comply – including by "terminat[ing] any independent dealer that seeks to offer competitive products." *Id.* at ¶ 96. And apparently, the threat was "widely communicated to independent dealers," including during the 2017 International Wireless Communications Expo in Las Vegas. *Id.*

At this 2017 Las Vegas industry meeting, Motorola held a dealer-only meeting with independent dealers across the United States. *Id.* at ¶ 99. At the meeting, Motorola's CEO allegedly "gave a speech to dealers from across the country indicating that [Motorola] was upset about the competition from Hytera in the United States." *Id.* Hytera tells us that this was "understood in the industry to be a threat to coerce independent dealers into de facto exclusivity" with Motorola. *Id.*

And apparently, these threats grew increasingly problematic. Motorola next sent a letter in the summer of 2017 "threatening dealers with termination of their dealership . . . if they carry competing Hytera product lines." *Id.* at ¶ 101.

Around the same time, Motorola discontinued one of its product lines, called "Vertex," which competed with its other products. This move required former Vertex-only dealers to become Motorola dealers, further consolidating the dealers in the LMR system industry. *Id.* at ¶ 102.

These dealers – particularly the larger dealers – are critical to the LMR suppliers. *Id.* at ¶ 105. They are "the most efficient agents to bidding on projects in the United States." *Id.* But Hytera says that many of them "act exclusively for [Motorola]." *Id.*

Hytera points to the New Jersey market as an example. In the New Jersey region, "the large dealers . . . are all exclusive to [Motorola]." *Id.* at ¶ 106. "Hytera estimates that this leaves Hytera with the opportunity to compete for a meager 1% to 4% of available sales in New Jersey." *Id.*

Hytera alleges that smaller dealers face the same pressure to sell Motorola products. *Id.* at ¶ 107. For example, a Motorola dealer in Vermont was originally amenable to selling Hytera products. *Id.* at ¶ 108. But after Motorola threatened to terminate the dealer's ongoing business, the dealer "terminate[d] discussions with Hytera." *Id.* Hytera tells a similar story about a dealer in South Carolina, who believes Motorola terminated its relationship with him "as retaliation for the South Carolina dealer's decision to sell Hytera products." *Id.* at ¶ 109. And these aren't isolated examples. Indeed, Hytera alleges a litany of similar examples of Motorola punishing and threatening its dealers for working with its competitors. *Id.* at ¶¶ 107–20.

As Hytera sees it, these terminations didn't happen in a vacuum. The rest of the industry was well aware of Motorola's retaliatory actions. The dealer terminations "became public knowledge because [Motorola] publicizes the dealership terminations by word of mouth and directs its other dealers' [sic] to actively target the former dealers' customer accounts." *Id.* at ¶ 121. Hytera paints this as Motorola's attempt to maintain exclusivity and foreclose competition from suppliers like Hytera. *Id.*

### B. Tying and Leveraging

As discussed above, the public safety sector comprises a huge portion of the LMR industry in the United States. *Id.* at ¶ 122. And Motorola is – by far – the biggest supplier in that sector. Motorola has "more than a 70% share of [the] sales of the terminals and systems used" in that sector. *Id.* at ¶ 123. And it is an "equally dominant provider of maintenance and service to public safety customers." *Id.*

Hytera says that Motorola "relies on its dominance in the U.S. public safety sector to exert pressure on and demand exclusivity from its dealer channel partners in the United States." *Id.* at ¶ 124. Hytera likens this to Motorola "buil[ding] a moat around the U.S. public safety market." *Id.*

Hytera alleges that Motorola leverages its public sector dominance in two big ways: (1) excluding TETRA, the primary LMR standard *outside* the United States; and (2) using its public sector service contracts to require exclusivity from its dealers.

How has Motorola excluded the TETRA technology in the United States? Hytera says that Motorola has taken multiple actions to ensure the Motorola-developed-and-dominated P25 technology remains the industry standard. And it worked: in the U.S., the public safety sector principally uses the P25 technology, a Motorola-dominated product. *Id.* at ¶ 125.

Hytera alleges that the P25's dominance in the U.S. is no accident. Motorola "engaged in a coordinated scheme" to slow TETRA's growth in the United States "from 2009 through at least 2016." *Id.* at ¶ 126. Apparently, Motorola did this by "act[ing] to control and influence relevant trade associations and industry bodies to prevent" the FCC's approval of TETRA. *Id.*

But Motorola's scheme failed. TETRA was approved. So Motorola allegedly changed course, "challenging and protesting the award of any contracts to TETRA providers." *Id.*

Hytera provides detailed examples, and, as before, New Jersey is in the spotlight. Apparently, the New Jersey Transit Authority awarded a 2013 TETRA contract for bus radios to Motorola's competitor Alcatel-Lucent and subcontractor PowerTrunk. *Id.* at ¶ 130. Motorola responded by unsuccessfully petitioning the FCC to repeal its authorization of TETRA in the United States. *Id.* So, with the technology now allowed in the United States, TETRA technology providers were viable candidates.

Competitor Parsons Transportation Group and subcontractor PowerTrunk won a TETRA contract in 2016, this time with the New York City MTA. *Id.* at ¶ 132. Motorola also bid on that contract, but lost. After losing, Motorola "continued to petition to overturn that loss without any legitimate basis." *Id.*

Next, Hytera alleges that Motorola leverages its public sector contracts by requiring exclusivity from its dealers. *Id.* at ¶ 134. To understand how, one must understand the payment structure for these dealers. An extremely profitable element of a dealer's relationship with the public-safety LMR supplier "comes from fulfilling service and maintenance contracts for public safety customers, emergency responders, and some utility customers." *Id.* at ¶ 135. These contracts can be so profitable that many of the dealers "rely on this consistent service/ maintenance income to support their businesses." *Id.*

But if these dealers choose to carry competing products, Motorola can reassign these service accounts to other dealers. *Id.* at ¶ 136. And, according to the complaint, Motorola does just that. *Id.* By demanding exclusivity of these companies – by threatening to restrict some of their most profitable contracts – Motorola "is able to leverage these relationships with dealers to prevent [them] from selling competing products for any purpose." *Id.* at ¶ 137.

## C.     Coordinated Campaign of False Rumors and Misinformation

Motorola also spreads "misinformation and misstatements against Hytera." *Id.* at ¶ 138. Hytera pinpoints the start of this "campaign of misrepresentations" to the same Las Vegas 2017 trade show where it allegedly threatened to terminate its business with dealers that carry Hytera products. *Id.* at ¶ 139.

This trade show ran from March 27 through March 31, 2017. Two weeks before the industry gathered at this trade show, Motorola sued Hytera (in a separate lawsuit, not this one). *Id.* at ¶ 140. During the trade show, Motorola sued Hytera again (same). *Id.* Hytera says that Motorola "orchestrated its filings as if they were product launch events," and "announc[ed] [the suits] as it did its broader trade show marketing." *Id.* Hytera faults Motorola for "using the litigations as a sales weapon." *Id.* Motorola apparently told its dealers and customers that Hytera would "be out of business in a year," thanks to these lawsuits. *Id.*

This behavior didn't stop at the trade show. Instead, it "reflects a pattern." *Id.* at ¶ 141. Hytera points to Motorola's recent "false statements . . . about Hytera's ability to compete." *Id.* The misrepresentation? "Hytera is no longer permitted to sell or support its products in the United States." *Id.* Hytera says this is false, and misrepresents the result of the ITC proceedings. Recall that the ITC proceedings resulted in a recommendation by the ITC Administrative Law Judge in July 2017. According to Motorola, the ALJ found that Hytera's digital two-way radios

infringed four of Motorola's patents. *See* Mtn. to Dismiss, at 4 (citing ITC Initial Determination (Dckt. No. 89-2)). Motorola also attached the ITC's ultimate decision, affirming in part and reversing in part the ALJ's decision. *See* ITC Decision (Dckt. No. 89-4).

Hytera alleges that Motorola "spread the false rumor that the ITC's Administrative Law Judge ('ALJ') has issued an order in July 2017 blocking Hytera from selling to new customers or supporting existing customers." *Id.* As Hytera tells it, "the ALJ . . . made no such order." *Id.* Instead, the ALJ's recommendation was more limited than Motorola would lead its customers to believe. It "does not cover all Hytera products." *Id.* at ¶ 142. Plus, Hytera "submitted design-arounds for ITC consideration." *Id.* Ultimately, Hytera says, "Hytera will not be forced to exit the U.S. market." *Id.*

Motorola made similar misrepresentations about the impact of a German patent court proceeding, too. *Id.* at ¶ 141. Hytera alleges a long list of other misstatements, with detailed descriptions of who said the statement and to whom. *Id.* at ¶¶ 147–157.

These misstatements come at a high price. LMR purchases are often long-term investments, and customer relationships are paramount. *Id.* at ¶ 143. A reputational blow can be problematic. *Id.* And Hytera says that the representations "foreclose[] Hytera from competing on the merits for . . . dealers," and they "suppress competition." *Id.* at ¶¶ 158–59.

### D.    Serial Sham Petitioning

Finally, Hytera alleges that Motorola "has a long history . . . of abusing the legal system, in particular petitioning to the FCC and local government agencies, for anticompetitive purposes." *Id.* at ¶ 160. It has a "reputation for reflexive petitioning without regard to the legal merits and uses that effort as a sales tactic." *Id.* Hytera says that this "serial petitioning is itself a competitive harm." *Id.*

Hytera points to three events as part of this "serial sham petitioning": (1) Motorola's FCC petition, challenging its approval of TETRA technology; (2) its related protest to the MTA, challenging its loss to a PowerTrunk TETRA bid; and (3) an FCC raid of Hytera's booth at the industry trade show, which Hytera says was the result of a Motorola complaint about Hytera. *Id.* at ¶¶ 160–71. Hytera says that the attempted petitions were shams. *Id.* at ¶ 171. These sham petitions were "designed to cast doubt and uncertainty on Hytera's viability and to create delay and add costs to Hytera's competition for customer contracts." *Id.*

## III. Relevant Markets and Motorola's Share

With those underlying facts as the backdrop, Hytera defines two relevant product markets: (1) the mission-critical LMR solutions market (with submarkets for (a) public safety customers, and (b) utility and transportation customers); and (2) the business-critical LMR solutions market. *Id.* at ¶ 172. And it alleges that the relevant geographic market is the United States. *Id.*

Under these product market and geographic market definitions, Hytera says that "[Motorola] has, and at all relevant times had, monopoly power, i.e. the power to control prices and/or exclude competition." *Id.* at ¶ 211. By revenue, Motorola controlled "no less than 75% of the submarket for Mission-critical LMR Solutions sold to public safety and emergency responder customers." *Id.* at ¶ 213. And a more recent estimate puts its share at "nearly 80%." *Id.* Motorola has a similarly high share in the mission-critical transportation and utility submarket, with a market share of 65% by revenue. *Id.*

Hytera paints a picture of an industry that favors the established players. It alleges a number of barriers to entry in the market, including high initial capital investments and high customer switching costs. *Id.* at ¶¶ 217–19. Ultimately, Hytera says that Motorola's monopoly

power "includes its ability to control prices and raise prices above those that would be charged in a competitive market." *Id.* at ¶ 224.

Motorola's market power and alleged monopoly significantly impact the industry – and it has broader impacts, too. True, Hytera is impacted, as are Motorola's other competitors. *Id.* at ¶ 228. But Hytera sees bigger implications. "The American customer and taxpayer suffers from high prices," thanks to the lack of competition. *Id.* at ¶ 232. And innovation in the market is stifled, because "competitors are unwilling to invest." *Id.*

## IV.    This Lawsuit

Hytera ultimately sued Motorola in the United States District Court for the District of New Jersey. *See* Cplt. (Dckt. No. 1). Motorola moved to transfer to the Northern District of Illinois, and the New Jersey Court granted that motion. *See* Pls.' Mtn. to Transfer (Dckt. No. 22); 12/6/2018 Order (Dckt. No. 50).

Before the transfer, Hytera filed an amended complaint. *See* Am. Cplt. (Dckt. No. 45). It brings nine claims for relief, including five federal claims and four state claims. *Id.* Specifically, Hytera alleges: (1) monopolization in violation of section 2 of the Sherman Act; (2) attempted monopolization in violation of section 2; (3) agreements in restraint of trade in violation of section 1 of the Sherman Act; (4) unlawful exclusionary arrangements in violation of section 3 of the Clayton Act; (5) a violation of the California Business and Professions Code; (6) a violation of Florida's Deceptive and Unfair Trade Practices Act; (7) monopolization under the New Jersey Antitrust Act; (8) attempted monopolization under the New Jersey Antitrust Act; and (9) false designations of origin, false descriptions, and dilution under the Lanham Act. *Id.*

Motorola moved to dismiss the complaint in its entirety. *See* Def.'s Mtn. to Dismiss (Dckt. No. 88); Def.'s Mem. (Dckt. No. 89).

14

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.3d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Discussion

Hytera lodges nine claims for relief in its amended complaint. It alleges that Motorola violated multiple federal and state laws by its anticompetitive behavior.

As Motorola sees it, Hytera is dragging Motorola into court as retaliation for its string of successes in the recent intellectual property lawsuits. *See* Def.'s Mtn. to Dismiss, at 3–5 (Dckt. No. 89). Motorola points out that Hytera's original complaint called its (original) Northern District of Illinois lawsuit and ITC lawsuit "sham" litigation – but removed those claims once Motorola was successful in both suits. *Id.* at 5. Ultimately, Motorola makes five primary arguments in support of its motion to dismiss. *See* Def.'s Mem. (Dckt. No. 89). The Court will address each argument in turn.

# I.    Section 2 of the Sherman Act (Counts I & II)

Hytera alleges that Motorola both monopolized and attempted to monopolize in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.  *See* Am. Cplt., at ¶¶ 235–51 (Dckt. 45). Motorola argues that Hytera fails to state a monopolization claim for any of the three alleged markets and submarkets:  (1a) the public safety market, (1b) the utility/ transportation market, and (2) the business critical market.  *Id.* at ¶ 7.

To state a section 2 monopolization claim, a plaintiff must allege "(1) that the [defendant] possessed monopoly power in that market; and (2) that the [defendant] willfully acquired or maintained that power by means other than the quality of its product, its business acumen, or historical accident."  *Mercatus Grp. LLC v. Lake Forest Hosp.*, 641 F.3d 834, 853 (7th Cir. 2011) (citing *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427, 430 (7th Cir. 1980)).  And to state a section 2 attempted monopolization claim, a plaintiff must allege "(1) the [defendant's] specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed."  *Mercatus Grp.*, 641 F.3d at 854 (citing *Lektro–Vend Corp. v. The Vendo Co*., 660 F.2d 255, 270 (7th Cir. 1981)).

The second element is the same for both a monopolization claim and an attempted monopolization claim.  A plaintiff must allege that the defendant "engaged in predatory or anticompetitive behavior of some kind."  *Mercatus Grp.*, 641 F.3d at 854.  The existence of a monopoly alone is not enough.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.").  Instead, to violate section 2, a firm must both (1) possess "monopoly

power in the relevant market" *and* (2) engage in "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Viamedia, Inc. v. Comcast Corp*., 951 F.3d 429, 451 (7th Cir. 2020) (quoting *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)).

Motorola doesn't take issue with Hytera's allegations that it has a monopoly in each of the relevant markets.  As described above, Hytera alleges two major product markets.  And Hytera alleges that Motorola has control over a significant portion of each product market, as defined.  *See* Am. Cplt., at ¶¶ 213–16 (Dckt. No. 45).  Motorola does not attack those allegations at this stage (and this Court must accept them as true anyway, given the procedural posture).  *See* Def.'s Mem. (Dckt. No. 89).

Instead, Motorola is laser focused on Hytera's allegations of anticompetitive conduct. First, Motorola argues that the *Noerr-Pennington* doctrine bars Hytera's claims that Motorola unlawfully monopolized the Public Safety market.  Second, Motorola argues that Hytera's section 2 monopolization claims for the utility submarket and business-critical market fail for a whole host of reasons.

### A. *Noerr-Pennington* Doctrine

Hytera alleges that there is a distinct product submarket in the public safety sector, within the larger mission-critical product market.  *See* Am. Cplt., at ¶ 172.  These customers include "First Responders," "Federal Government Agencies," and "Local Government Agencies."  *Id.* at ¶ 83.  The public safety customers have distinct needs for their LMR Systems, thanks to the

extreme environments they face.  *Id.* at ¶ 84.  These contracts are typically "awarded through a public bidding process."  *Id.* at ¶ 85.

Motorola argues that Hytera's public safety market allegations are cabined into one assertion:  that Motorola "engaged in a 'scheme to retard the growth' of an industry standard for LMRs sold to the Public Safety Market, known as Terrestrial Trunked Radio ('TETRA')."  *See* Def.'s Mem., at 6 (Dckt. No. 89) (quoting Am. Cplt., at ¶ 126 (Dckt. No. 45)).

As Motorola reads the complaint, Hytera alleges that Motorola spent its time trying to torpedo Hytera by "(1) petitioning the FCC to repeal and clarify its allowance of TETRA products in the U.S., and (2) submitting a competing bid to the NYC MTA for a new bus radio system contract, and protesting the award to a New York-based TETRA provider (with Plaintiff PowerTrunk, Inc. as a subcontractor)."[2]  *See* Mtn. to Dismiss, at 8–9 (Dckt. No. 89).

According to Motorola, those acts are perfectly within the bounds of the law.  *Id.*  It argues that these "appeals to governmental entities" are immune from antitrust attacks under the *Noerr-Pennington* doctrine.

Under the *Noerr-Pennington* doctrine, the federal antitrust laws "have been interpreted to protect . . . First Amendment rights by immunizing petitioning activity from liability."  *Mercatus Grp.*, 641 F.3d at 837.  The First Amendment provides that Congress shall make no law abridging the "right of the people . . . to petition the Government for a redress of grievances."  *See* U.S. Const. amend. I.  The antitrust laws rest on a statute, which cannot displace the constitutional foundation protecting the right to speak freely and petition the government.

---

[2]  According to Motorola, Hytera's other allegations about "de facto" exclusive dealing agreements *couldn't* apply to the public safety market because the "de facto" exclusive dealing agreements allege that Motorola's bad behavior impacted the dealers, and the public safety market doesn't work through dealers.  *See* Def.'s Mem., at 6–7 (Dckt. No. 89) (citing Am. Cplt., at ¶¶ 15, 180 (Dckt. No. 45)).  Instead, these products are "sometimes not bid through dealers, but directly from manufacturers so as to ensure an appropriate, customized solution is available."  *See* Am. Cplt., at ¶ 180.

The *Noerr-Pennington* doctrine thus "bars Sherman Act suits against persons who associate for the purpose of restraining trade and competition if they pursue this purpose through legitimate political means." *LaSalle Nat. Bank of Chicago v. DuPage County*, 777 F.2d 377, 384 n.6 (7th Cir. 1985); *see also E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657 (1965). The doctrine extends "absolute immunity under the antitrust laws to 'businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects.'" *Mercatus Grp.*, 641 F.3d at 841 (quoting *Wilk v. Am. Med. Ass'n*, 719 F.2d 207, 229 (7th Cir. 1983)).

Hytera agrees with Motorola's point, to a point. Hytera acknowledges that it is "without dispute" that *Noerr-Pennington* protects legitimate petitioning activities. *See* Pls.' Resp., at 16 (Dckt. No. 95). But Hytera says Motorola's actions weren't legitimate at all. *Id.* at 15. They were a sham. *Id.* And *Noerr-Pennington* doesn't protect sham petitioning. *Id.* at 15 (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)).

Courts do recognize an exception for sham petitioning. The concept dates back to *Noerr* itself, when the Supreme Court acknowledged that "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Noerr*, 365 U.S. at 144.

Since *Noerr* first introduced it, the exception has come into sharper focus. The sham exception holds liable "objectively baseless lawsuits brought in 'an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process – as

opposed to the outcome of that process – as an anticompetitive weapon.'" *U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chicago, Inc.*, 953 F.3d 955, 963 (7th Cir. 2020) (quoting *Prof'l Real Est. Inv., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993)).

But the sham exception is "extraordinarily narrow." *U.S. Futures Exch.*, 953 F.3d at 963 (quoting *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1061 (9th Cir. 1998)). It requires a court to analyze both an objective and a subjective element of the petitioning. The two-step inquiry goes as follows: "(1) only if challenged litigation is objectively meritless may a court (2) examine the litigant's subjective motivation." *U.S. Futures Exch.*, 953 F.3d at 963. That is, objectively reasonable suits enjoy immunity, regardless of the subjective intent behind the suit. *Id.* Only once a court finds the suit was objectively unreasonable does the subjective intent become relevant. *Id.*

An action is considered "objectively reasonable" if an objective litigant could "conclude that the suit is reasonably calculated to lead to a favorable outcome." *Prof'l Real Est. Inv.*, 508 U.S. at 60. Or, looking at it another way, a lawsuit receives no *Noerr-Pennington* immunity if it is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Id.*

Here, Hytera alleges two Motorola actions that could be considered petitioning activity: its petition to the FCC to ban the TETRA technology, and its challenge to the New York MTA's contract award to Defendant PowerTrunk's TETRA products. *See* Am. Cplt., at ¶¶ 163–64 (Dckt. No. 45). As alleged, both relate directly to the TETRA technology.

The parties talk past each other about whether the allegations constitute a "serial sham." Hytera points to *California Motor Transport Co.*, which said that a "pattern of baseless,

repetitive claims" could be a "form . . . of illegal and reprehensible practice" that could corrupt the administrative or judicial processes. *Cal. Motor Transp. Co.*, 404 U.S. at 513.

After the parties filed their briefs, the Seventh Circuit drilled down on that exception. The Seventh Circuit explained that alleging a "pattern" of baseless, repetitive claims did not lower the bar for plaintiffs. *See U.S. Futures Exch.*, 953 F.3d at 964 (citing *Cal. Motor Transp. Co.*, 404 U.S. at 508, 512–13). That is, the Seventh Circuit made clear that alleging a "pattern" of baseless, repetitive claims does not alter the two-step inquiry. *US Futures Exch.*, 953 F.3d at 964 (citing *Prof'l Real Est. Inv.*, 508 U.S. at 58).

Courts must walk through both steps of the "sham" exception inquiry, meaning the objective element and the subjective element. Even if there is a pattern of "baseless" petitions, a court can't simply "discard the first question of the two-part sham inquiry," and skip to the subjective inquiry.[3] *Id.* A pattern is not a springboard for skipping a step.

In most cases, the *Noerr-Pennington* doctrine protects this exact petitioning behavior from an antitrust challenge. But Hytera also alleged facts – which the Court must assume are true – to suggest that the sham exception applies to the alleged petitioning activity. For now, that is enough.

At this early stage, Hytera's complaint survives the *Noerr-Pennington* bar. For each of these actions, Hytera alleged that the sham exception applies. Hytera alleges that the petitions were objectively baseless and unreasonable on the merits. *See* Am. Cplt., at ¶ 163 (Dckt. No. 45) ("These petitions were objectively baseless and filed with intent of simply delaying or preventing

---

[3] As Defendant points out, it's questionable whether these allegations could amount to a "serial sham," anyway. *See* Def.'s Reply, at 1 (Dckt. No. 98). There are only two petitions alleged – hardly a pattern. Other courts have held that "two proceedings . . . does not constitute a pattern" sufficient to allege a "serial" sham claim. *Id.* (citing *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 157 (3d Cir. 2017)).

the approval of Hytera's TETRA products for sale in the United States."); *see also id.* at ¶ 165 (discussing Motorola's FCC petition challenging its approval of TETRA technology and noting that "[n]o reasonable petitioner in MSI's position could have expected success on this petition, most notably because the March 2016 Petition took a position that MSI had directly opposed before the FCC just the previous year"); *id.* at ¶ 169.

What's more, Hytera alleged *why* these challenges were baseless. For example, Motorola argued that the TETRA system should be compliant with the P25 protocols. *Id.* at ¶ 165. But in the prior year, Motorola had taken the exact *opposite* position, arguing that requiring P25 compliance would be "burdensome to the industry." *Id.* at ¶ 166. And its challenge ignored the fact that the product was "already P25 compatible."

According to Hytera, there was no chance this petition would work. Instead, Motorola merely drummed up the petition to delay and cause problems to TETRA dealers. The FCC ultimately rejected Motorola's challenge.

Hytera made similar allegations about Motorola's challenge to the MTA award, too. *Id.* at ¶ 169 (discussing MTA award and noting that "the objectively baseless nature of [Motorola's] claims were made clear by its own bid."); *see also id.* ("No objective petitioner in [Motorola's] circumstances could have expected to succeed on the merits of such a petition where the core position of the petition was contradicted by Motorola's own bid.").

And Hytera also alleged that Motorola *subjectively* intended to restrict competition through its petitioning actions. *See, e.g.*, *id.* at ¶ 166 (discussing TETRA challenge and noting that "[Motorola's] changed position . . . is indicative of [Motorola's] subjective intent to hold up and delay the advancement of TETRA in the United States"); *id.* at ¶ 171 (discussing the MTA challenge and noting that "[t]he above anticompetitive conduct is part of a considered scheme to

eliminate critical channels of competition for Hytera and compound the effect of that foreclosure through a campaign of misinformation and serial sham petitioning designed to cast doubt and uncertainty on Hytera's viability and to create delay and add costs to Hytera's competition for customer contracts").  Hytera alleged facts to meet both prongs of the "sham" exception.

Other courts in this District have found that the *Noerr-Pennington* issue is inappropriate for resolution at the motion to dismiss stage, especially when the plaintiff included allegations that the petitioning activity amounted to a sham.  *See, e.g.*, *Wash. Cnty. Health Care Auth. v. Baxter Int'l, Inc.*, 328 F. Supp. 3d 824, 844 (N.D. Ill. 2018) ("The Court finds that this issue is ill-suited for resolution on a motion to dismiss . . . .  Immunity is an affirmative defense, and at the motion to dismiss stage, 'dismissal is appropriate only when the factual allegations in the complaint unambiguously establish all elements of the defense.'") (citation omitted); *Frayne v. Chicago 2016*, 2009 WL 65236, at *4 (N.D. Ill. 2009) (denying a motion to dismiss because the plaintiff "raised the issue of whether the . . . proceedings were a sham designed to injury him, thus rendering the *Noerr-Pennington* doctrine inapplicable"); *Eazypower Corp. v. Alden Corp.*, 2003 WL 22859492, at *3 (N.D. Ill. 2003) (denying a motion to dismiss "[e]ven though [the defendant] ultimately may be protected by the *Noerr-Pennington* doctrine," because plaintiff "alleged sufficient facts of bad faith to withstand a motion to dismiss"); *Knoll Pharmaceuticals Co. v. TEVA Pharmaceuticals*, 2001 WL 100117, at *4 (N.D. Ill. 2001) (finding a defendant adequately pled its antitrust counterclaim under *Noerr-Pennington* when it alleged that the lawsuit is "objectively baseless," that there was "no reasonable justification" for the belief that the enforcement action would be successful, and that the lawsuit was filed with the "sole intention of prolonging [Plaintiff's] monopoly").

And in cases where the court granted a motion to dismiss because the activity was protected by *Noerr-Pennington* immunity, the complaints lacked allegations to support an argument that the sham exception applied.  *See, e.g.*, *Pelfresne v. Village of Lindenhurst*, 2005 WL 2322228, at *9 (N.D. Ill. 2005) ("Notably, there is nothing to suggest that the Zale and KB Defendants' 'activities [were] not genuinely aimed at procuring favorable government action.'").  Here, however, Hytera's complaint alleges that Motorola had no hope of winning these actions, and that there was an intent to delay the proceedings to harm Hytera.

The Court holds that the facts alleged about each petition are sufficient to evade the *Noerr-Pennington* doctrine.  To decide otherwise, the Court would have to weigh the facts in the complaint against the facts lodged by Motorola in its motion to dismiss.  That's not appropriate at the pleading stage, where the Court assumes Hytera's facts are true and draws reasonable inferences in its favor.  *See AnchorBank*, 649 F.3d at 614.  Motorola's actions may ultimately be protected by the *Noerr-Pennington* doctrine, but in the meantime, Hytera has alleged sufficient facts to withstand the motion to dismiss.

Overcoming *Noerr-Pennington* is a steep climb and a tall order.  But for now, the complaint alleges enough to give Plaintiff a chance to embark on that effort.  Time will tell if the claim survives.

### B.    The Utility Submarket and the Business Critical Market

Motorola next moves to dismiss Hytera's section 2 claims with respect to the utility/transportation submarket and the business critical market.  *See* Def.'s Mem., at 11–12 (Dckt. No. 89).  Motorola argues two major points:  (1) Hytera fails to plead facts that Motorola

entered into exclusive dealing agreements; and (2) Hytera's false statement allegations fail to support an antitrust claim.

### 1. Exclusive Dealing Agreements

Motorola attacks the exclusive dealing allegations from several angles. First, it argues that the "de facto" exclusive dealing arrangements are allowed under the antitrust laws. Second, it contends that any alleged "threats" to dealers are insufficient to allege an exclusive dealing agreement. Third, Motorola claims that Hytera didn't allege that the exclusive dealing agreements foreclosed competition. And fourth, it argues that Hytera's allegations under the essential facilities doctrine fail. *See* Def.'s Mem., at 14–18 (Dckt. No. 89).

As stated above, the relevant section 2 inquiry here is whether Motorola "willfully acquire[d]" or "maintain[ed]" its monopoly power in the LMR markets, or whether its dominance is merely "a consequence of a superior product or business acumen" or the result of an "historic accident." *See Viamedia, Inc.*, 951 F.3d at 452. Exclusionary actions that constitute anticompetitive conduct include "tie-in sales (or another form of bundling), group boycotts, exclusive dealing and selective refusal to deal, or predatory pricing." *Schor v. Abbott Lab'ys*, 457 F.3d 608, 610 (7th Cir. 2006). Here, Hytera has alleged sufficient facts to suggest that Motorola has maintained its monopoly power through such conduct.

In particular, Hytera alleges that Motorola maintained its power through exclusive dealing agreements with its dealers. An exclusive dealing contract "obliges a firm to obtain its inputs from a single source." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 956 (N.D. Ill. 2018). Courts often approve these sorts of exclusive dealing agreements – that is, they find that such conduct can be perfectly legal – because of the "procompetitive benefits" of exclusivity. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 956; *see also*

25

*Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004). The benefits include "increasing allocative efficiency, reducing adverse selection and moral hazard barriers to deals, and preventing free-riding." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 956 (quoting *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *12 (N.D. Ill. 2015)).

But not all exclusive dealing contracts are above board. "[S]ome exclusive-dealing arrangements run afoul of the Sherman Act." *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (2017) (citing *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984)). To properly allege a Sherman Act violation grounded in an exclusive dealing arrangement, then, the plaintiff must allege that the arrangement forecloses competition. *See Republic Tobacco Co.*, 381 F.3d at 737–38 ("[E]xclusive dealing arrangements violate antitrust laws only when they foreclose competition in a substantial share of the line of commerce at issue.") (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 320–27 (1961)).

Motorola argues that Hytera has failed to make the requisite allegation that these exclusive dealing agreements foreclose competition. *See* Def.'s Mem., at 16 (Dckt. No. 89). The Court disagrees.

Hytera has alleged that Motorola's exclusive dealing agreements foreclose competition for dealers in these markets. Dealers – particularly the large dealers – are allegedly critical to competing in the industry, and many of them "act exclusively" for Motorola. *See* Am. Cplt., at ¶ 105 (Dckt. No. 45). Their exclusivity to Motorola is allegedly no accident at all. Instead, Hytera has "lost numerous business propositions" with these large dealers *because of* Motorola's alleged conduct. *Id.* Hytera alleges that Motorola's CEO threatened to cancel its contracts with

26

dealers that also sold Hytera's products at an industry conference.  *Id.* at ¶ 99.  Motorola also allegedly sent a letter to its dealers, "threatening [them] with termination of their dealership with [Motorola] if they carry competing Hytera product lines."  *Id.* at ¶ 100.

The make-up of the market suggests that Motorola is in control, too.  Hytera alleges that the market is largely skewed in favor of Motorola.  Motorola allegedly controls 75% of the mission critical public safety product submarket, and 65% of the utility and transportation submarket.  *Id.* at ¶¶ 213–14.

Other courts, like *In re Dealer Management System Antitrust Litigation*, have found similar allegations sufficient to state a claim.  *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 957–58.  In that case, the court found that the plaintiff had pled sufficient facts to "indicate that these exclusive-dealing contracts could foreclose a substantial portion of the data-integration market," pointing to the allegations that each defendant accounted for "at least 30 percent of the . . . market," or a collective "90 percent if judged by cars sold."  *Id.* at 957.  The complaint further alleged that there are "few, if any, [vendors] that could survive without serving [defendant] dealers."  *Id.*  Ultimately, the court found that these allegations "raise a reasonable inference that, if enforced, Defendants' exclusive-dealing provisions with vendors could foreclose a substantial portion of the . . . market and reduce output."  *Id.* at 958 (citations omitted).

Hytera has made materially similar allegations.  Indeed, Hytera has alleged that Motorola controls even more of the market by revenue than any of the individual defendants in the *Dealer Management* case.  Motorola allegedly controls 75% of the public safety submarket and 65% of the utility and transportation submarket.  *See* Am. Cplt., at ¶¶ 213–14 (Dckt. No. 45).  Hytera has also alleged that access to dealers is critical to competing in these markets.  *Id.* at ¶ 25 ("Without

access to dealers, rivals are foreclosed from [the public safety] market."); *id.* at ¶ 105 ("These larger dealers are necessary and the most efficient agents to bidding on projects in the United States."). Wielding all of that power, Motorola allegedly threatened to take its business away from dealers and rewarded dealers that acted exclusively on behalf of Motorola. Motorola's importance in the market – particularly, the public safety market – made its threats particularly potent. *Id.* at ¶¶ 136–37. Motorola allegedly leverages its public safety dominance to prevent "dealers from selling competing products for *any* purpose, whether it is to public safety customers, public utilities, or commercial customers." *Id.* at ¶ 137 (emphasis added).

Ultimately, Hytera's allegations paint a picture of an anticompetitive market that is no accident. Hytera alleges that Motorola's actions led to a lower supply of mission critical solutions for all of its customers, and limited business critical solutions for its commercial and industrial customers, with Motorola "reducing market output below what would have prevailed" without its anticompetitive conduct. *Id.* at ¶ 231. Hytera's factual assertions support this allegation, and could lead to an inference that its exclusive dealing "could foreclose a substantial portion of the . . . market and reduce output." *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 958 ("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage.") (citing *In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*, 2013 WL 812143, at *19 (D.N.J. 2013)).

Defendant's other arguments against Hytera's claims are premature. For one, Motorola argues that its "point systems to induce exclusivity" associated with its PartnerEmpower Program are perfectly legal. *See* Def.'s Mem., at 13 (Dckt. No. 89). As a reminder, Motorola's "PartnerEmpower Program" at the center of its "de facto" exclusivity plan rely on a "point

28

system to induce exclusivity" with Motorola.  *See* Am. Cplt., at ¶¶ 14, 93 (Dckt. No. 45).
Motorola notes that Hytera doesn't allege a written exclusivity agreement, and fails to allege an
incentive program that "forecloses [Motorola's] dealers from dealing with Hytera."  *Id.*

As Hytera points out, it *does* allege that there are written agreements between Motorola
and the dealers.  *See* Pls.' Resp., at 10 (Dckt. No. 95) (emphasis in original) (citing Am. Cplt.
¶¶ 93–95 (Dckt. No. 45)).  Hytera alleges that these agreements "incentivize dealers to only sell
MSI products," and that they are "scaled to realize MSI sales exclusivity and effectively
foreclose MSI dealers from selling LMR products by MSI's competitors."  *See* Am. Cplt., at
¶¶ 93–95.

But these point systems are perfectly legal, according to Motorola.  *See* Def.'s Mem, at
13–14 (Dckt. No. 89).  That may be so – the Court does not decide today – but Hytera alleges
exclusive dealing beyond just these point systems.  These so-called point systems allegedly are
part of a larger anticompetitive scheme.

Among other things, Hytera also alleges that a Motorola memorandum threatened its
dealers with repercussions unless they exclusively dealt with Motorola, and that Motorola
leveraged their dominance in the public sector to ensure exclusivity across the industry.  Even if
some alleged actions – like the point systems – are innocent standing alone, it would be
inappropriate to ignore the bigger picture at this stage.  *See Fontana Aviation, Inc. v. Cessna
Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980).  "Standing separately some of the allegations
may be of no antitrust concern, but if all of [defendant's] alleged activities were combined and
coordinated with the intent to destroy [plaintiff], its target, as a competitor, the allegations,
whatever their merit, should be judged as a whole and not separately."  *Id.*

29

Motorola also takes aim at Hytera's "threat" allegations. Motorola says that these sorts of "threats" are insufficient to state a monopolization claim. *See* Def.'s Mem., at 15 (Dckt. No. 45). Motorola faults Hytera for failing to provide documentation and more specific facts to support its allegations that Motorola threatened its dealers. *Id.* ("Missing from the Complaint are allegations of who made the threats, when, and to whom."); *id.* ("Not only has Hytera failed to even attach the so-called 'threatening' letter or documentation of threats (assuming they exist) to the complaint . . . .").

Motorola asks too much of Hytera at the pleadings stage. The facts are sufficient to put Hytera on notice of the claims, even if the letter itself isn't attached to the complaint. The Federal Rules require pleading with particularity for fraud, but not for threats. *See* Fed. R. Civ. P. 9(b).

Motorola's piecemeal attacks on Hytera's section 2 claims might prove meritorious someday. But for now, there is more than enough to put Motorola on notice of Hytera's claim, and it passes the plausibility test based on the rest of the complaint. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("[T]he case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's 'plausibility.'").

## 2. False Statement Allegations

Motorola next takes aim at Hytera's allegations that Motorola engaged in a campaign of "false statements to customers and potential customers about Hytera's ability to compete." *See* Def.'s Mem., at 18 (Dckt. No. 89) (citing Am. Cplt., at ¶ 141 (Dckt. No. 45)). As Motorola sees it, "[n]ot only are these allegations . . . 'outside the reach of antitrust laws' . . . but Hytera

fails to allege that any such statements were *false.*"  *See* Def.'s Mem., at 18 (emphasis in original) (quoting *Mercatus*, 641 F.3d at 851).

Motorola is right that false statements about a competitor – without more – do not give rise to an antitrust violation.  *See Sanderson v. Culligan Int'l Co.,* 415 F.3d 620, 623 (7th Cir. 2005).  "Antitrust law condemns practices that drive up prices by curtailing output."  *Id.* (citing *Nat'l Collegiate Athletic Ass'n v. Univ. of Okla.*, 468 U.S. 85, 103–07 (1984)).  But "false statements about a rival's goods do not curtail output in either the short or the long run."  *Id.* Indeed, "[t]here is no obligation to be kindly or cooperative toward other producers."  *Id.* (citing *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)).  The Sherman Act does not referee any and all examples of unsportsmanlike conduct between competitors.

That said, allegations of false statements *plus* an "enforcement mechanism" can constitute impermissible antitrust behavior.  *See Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 2018 WL 3861575, at *5 (N.D. Ill. 2018) (noting that commercial speech without an enforcement mechanism does not violate the antitrust laws); *see also Schachar v. Am. Acad. of Ophthalmology, Inc.,* 870 F.2d 397, 399 (7th Cir. 1989) ("These enforcement mechanisms are the 'restraints' of trade.  Without them there is only uncoordinated individual action, the essence of competition.").  Hytera has alleged that Motorola has significant market share, and that it leverages that power to influence prices and output.  *See* Am. Cplt., at ¶ 231 (Dckt. No. 45) ("By foreclosing competitors, [Motorola] has been able to keep the supply of [its products] below competitive levels, thus reducing overall market output below what would have prevailed absent [Motorola's] anticompetitive agreements and conduct.  By reducing overall market output and

eliminating competitors, [Motorola] has been able to keep its prices above levels that would have prevailed in a competitive market.").

At this point, the Court does not need to decide whether Motorola's alleged false statements, standing alone, amount to an antitrust violation. Even if they don't, Hytera alleges that the false statements are part of a larger pattern of behavior, intended to maintain Motorola's monopoly. *See Preview Nexstar Broad., Inc. v. Granite Broad. Corp.*, 2012 WL 2838547, at *8 (N.D. Ind. 2012) ("The allegations of denigrating speech and predatory hiring standing alone might not suffice to state an antitrust claim, but [the plaintiff] doesn't contend they would. [The plaintiff] alleges that they are part of a course of conduct (or 'chain reaction') and show [the defendant's] intent to monopolize the television advertising market and destroy competition.") (citing *DSM Desotech Inc. v. 3D Sys. Corp*., 2009 WL 174989, at *10 (N.D. Ill. 2009)). And Hytera has alleged that Motorola has coercive enforcement mechanisms – including market power and the ability to limit output – to force dealers to deal with them exclusively. *Id.* Even if Motorola's statements aren't themselves antitrust violations, it wouldn't make sense to carve up the complaint to remove these false statements. The allegations could lend credence to a pattern of willful exclusionary behavior.

It's conceivable that Motorola's allegedly false statements – together with the rest of the alleged actions – harmed competition, and ultimately harmed customers. These allegations are sufficient, for now.

Motorola's motion to dismiss Counts I and II is denied.

## II.    Section 1 of the Sherman Act (Count III)

In its third claim for relief, Hytera alleges that Motorola violated section 1 of the Sherman Act. Hytera alleges that Motorola "possesses substantial market power in the relevant

markets, as demonstrated by MSI's high market share, barriers to entry, MSI's actual exclusion of competition, and its ability to charge supracompetitive prices in the relevant markets," and that it entered into exclusive dealing agreements with the "effect of unreasonably restraining trade and commerce in the relevant markets." *See* Am. Cplt., at ¶¶ 253–54 (Dckt. No. 45).

Under section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *See* 15 U.S.C. § 1. To plead a violation of section 1, then, a plaintiff must allege "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (citation omitted).

In order to allege a "contract, combination, or conspiracy," either direct evidence or circumstantial evidence will suffice. *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 949 (citing *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628–29). Motorola argues that Hytera hasn't done either. It says that Hytera fails to allege facts that satisfy the first element because there are no existing agreements.

As noted above, Hytera does allege that it had agreements with its dealers. *See* Am. Cplt., at ¶¶ 93–95 (Dckt. No. 45). Those agreements included the PartnerEmpower point-system incentive structure that Motorola allegedly used to reward its dealers for exclusivity, and to incentivize dealers to drop Motorola's competitors. *Id.*

And while these agreements may not fit within the notion of a traditional "contract, combination, or conspiracy," there are other types of collusive behaviors that can constitute a section 1 violation based on conspiracy – including coercion. The Seventh Circuit's decision in *MCM Partners v. Andrews-Bartlett & Assocs.*, 62 F.3d 967 (7th Cir. 1995), is instructive on this

33

point. In *MCM Partners*, a rental company (MCM Partners) alleged that one of its competitors, O.G. Service Corporation, conspired with two contractors to exclude MCM from the market. *Id.* at 969–70. O.G. allegedly threatened the contractors with business disruptions and property damage if they continued to transact with MCM. Soon after, the contractors canceled their business with MCM. *Id.* If the contractors' decisions to avoid MCM were based on independent business judgment, there would be no violation of section 1. *Id.* at 970–71. But MCM alleged that the threats – not the contractors' independent business judgment – caused these contractors to deal exclusively with its competitor, O.G. *Id.*

The district court dismissed the complaint, finding that the contractors' acquiescence to these threats could "not establish a combination or conspiracy for purposes of section 1 because the complaint itself indicated that [the contractors] acted only at the direction of and in response to pressure applied by OG and its principals – that is, that they were coerced victims of OG's scheme." *Id.* at 973.

The Seventh Circuit reversed. Even though the contractors' behavior was coerced, it could still meet the "combination or conspiracy" element of a section 1 violation. *Id.* (citing *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948)). "[C]ourts have applied this principle in a variety of settings, concluding that the 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *Id.* at 973–74 (collecting cases).

Hytera alleges that many of the dealers refuse to work with Hytera because of Motorola's threating statements and letters. *See* Am. Cplt., at ¶¶ 111–19 (Dckt. No. 45). And these threats drive the dealers to drop Hytera's business, in response to those coercive threats. *See, e.g.*, *id.* at ¶ 111 ("After the threats MSI made at the IWCE, the dealer renounced any ties to Hytera and

34

stopped returning Hytera's calls and emails."). Motorola allegedly has so much market power that if the dealers lose its business – especially in its service and maintenance contracts – it could harm the dealers. *See, e.g.*, *id.* at ¶ 135 ("The share of sales and maintenance contracts provided to MSI dealers, on a continuing basis, is a substantial value to MSI dealers."); *id.* at ¶ 136 (noting that Motorola "re-assign[s] these lucrative service accounts away from dealers that choose to carry competing products").

The coercion alleged here is too similar to the coercion in *MCM Partners* to be written off. Both cases involve an allegedly powerful party threatening damage to its business partners if they continue to work with its competitors. *See MCM Partners*, 62 F.3d at 972–73; *see also* Am. Cplt., at ¶¶ 111–119 (Dckt. No. 45).

It's true that the evidence might later show that the dealers' decisions to work with Motorola were the result of their independent business judgment, and not the result of any threats. But the Court will cross that bridge when it comes to it, down the road.

Motorola's motion to dismiss Count III is denied.

## III. Section 3 of the Clayton Act (Count IV)

In Count IV, Hytera alleges a violation of section 3 of the Clayton Act. *See* 15 U.S.C. § 14. Hytera says that Motorola's "solicitation and enforcement of the exclusionary contracts described above constitute unlawful agreements, contracts, and concerted activity that have the effect of substantially lessening competition in each relevant market in violation of Section 3 of the Clayton Act." *See* Am. Cplt., at ¶ 263 (Dckt. No. 45).

Motorola attacks Hytera's Clayton Act claim for the same reason that it attacked its Sherman Act claims: Hytera failed to allege "anticompetitive exclusive agreements." *See* Def.'s Mem., at 19–20 (Dckt. No. 89). The Court has already addressed that argument. Hytera has

35

alleged that such exclusive agreements exist, and that these exclusive dealing agreements have anticompetitive effects on the two-way radio markets. *See* Am. Cplt., at ¶¶ 93–95 (Dckt. No. 45). Motorola can lodge other attacks at the Clayton Act claims at a later stage, but for now, its objections fall short.

Motorola takes one more swing at both Hytera's Sherman Act section 1 and Clayton Act section 3 claims. Motorola argues that the absence of allegations about the dealer market's makeup – for example, how many dealers there are – means that there is "no basis that Motorola's alleged exclusive agreements with dealers might cause harm to competition." *See* Def.'s Mem., at 21 (Dckt. No. 89).

The Court disagrees. Hytera pleads detailed facts about the LMR systems markets, and makes allegations about the importance of dealers in those markets. *See* Am. Cplt., at ¶ 105 (Dckt. No. 45) (noting that access to larger dealers is "necessary" as they are "the most efficient agents to bidding on projects in the United States."). In one example, all but 4% of the New Jersey dealers are allegedly Motorola dealers, leaving Hytera to attempt to compete for just 1% to 4% of the remaining dealers. *Id.* at ¶ 106. Hytera has made clear that these dealers have a significant effect on the LMR systems market and alleges that many of them exclusively deal with Motorola.

Motorola's motion to dismiss Count IV is denied.

## IV.   State Law Claims (Counts V–VIII)

Hytera also brings a slew of claims under California, Florida, and New Jersey law. Motorola argues that Hytera has failed to allege facts sufficient to support application of any of these state laws. The Court will address each state claim in turn.

### A.    California Claims (Count V)

The Court begins with Hytera's claim under California law.  Hytera alleges that Motorola's actions violate the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*.  *See* Am. Cplt., at ¶¶ 269–275 (Dckt. No. 45).

Hytera argues that its allegations are sufficient to justify application of the California law for two reasons.  First, one of the Hytera Plaintiffs – Hytera Communications America (West) Inc. – is a California Resident.  *See* Pls.' Resp., at 22 (Dckt. No. 95).  And second, Hytera alleges that multiple dealers in California received threats from Motorola, asking the dealers to terminate their business with Hytera.  *Id.*  They argue that this is "more than sufficient" to establish standing for a UCL claim.

Hytera Communications America's status as a California resident – with its principal place of business in Irvine, California – justifies application of the UCL for injuries that Hytera suffered both in California and outside of California.  "When a plaintiff resides in California, the UCL may apply to out-of-state conduct, especially when the plaintiff suffered in-state harm." *See Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.,* 2017 WL 1436044, at *6 (N.D. Cal. 2017) (citations omitted).  Hytera alleges that it suffered in-state harm:  it lost business from multiple California dealers, thanks to Motorola's threats and allegedly false statements.  *See* Am. Cplt., at ¶ 111 (Dckt. No. 45); *see also Cave Consulting Grp.*, 2017 WL 1436044, at *6.

But the other entities – Hytera Communications Corporation Ltd., Hytera America Inc., and PowerTrunk – are not California residents.  True, the UCL "may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California."  *Muniz v. Wells Fargo & Co*., 2018 WL 2197556, at *4 (N.D. Cal. 2018) (citation omitted).  But for those entities, there is no allegation of wrongful conduct *occurring in* California.  Hytera only alleges

that it lost business from California dealers (so, it alleges in-state *harm*, but not in-state *conduct)*. *See* Am. Cplt., at ¶¶ 111–12, 115 (Dckt. No. 45). There are no allegations that the *conduct* occurred in California. *See Muniz*, 2018 WL 2197556, at *4 (dismissing allegations of injury to California resident as insufficient to assert that the acts occurred in California). Instead, Hytera alleges that Motorola made false or threatening statements to three California dealers. *See* Am. Cplt., at ¶¶ 111–12, 115. On one occasion, Motorola allegedly terminated its business with the dealer because it continued to sell Hytera products. *Id.* at ¶ 112. It's a mystery where Motorola took these actions. True, Hytera alleges that the dealers are based in California. But Hytera doesn't allege where the conduct itself occurred.

Substantively, Hytera pleads all three prongs of the UCL, which prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair deceptive, untrue, or misleading advertising." *See* Cal Bus. & Prof. Code § 17200; *see also In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 924–25 (C.D. Cal. 2011). That is, Hytera has alleged unfair, unlawful, and fraudulent acts. *See* Am. Cplt., at ¶ 270 (Dckt. No. 45). A plaintiff can establish that a business act is "unfair" by showing that such conduct "threatens an incipient *violation of an antitrust law*," among other things. *In re WellPoint, Inc.*, 903 F. Supp. 2d at 927 (emphasis added) (quoting *Byars v. SCME Mortg. Bankers, Inc*, 109 Cal. App. 4th 1134, 1147 (2003)). And an "unlawful" business act is "any business practice that is prohibited by law, whether 'civil or criminal, statutory or judicially made . . . federal, state or local." *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d at 1048–49. Because Hytera has adequately stated a claim under the Sherman Act, then, Hytera has stated a claim under the UCL's unfair and unlawful prongs. *Id.*

38

But Plaintiff's UCL claims also sound in fraud.  *See* Am. Cplt., at ¶ 270 (Dckt. No. 45).

Fraud claims based on the UCL are subject to the heightened pleading requirements of Federal

Rule of Civil Procedure 9(b).  *Id.* (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124–25

(9th Cir. 2009)).  To meet this heightened pleading requirement, Hytera must plead the "who,

what, when, where, and how of the alleged fraudulent conduct," and explain "why [a] statement

or omission complained of was false and misleading."  *In re WellPoint*, 865 F. Supp. 2d at 1047

(quoting *In re Actimmune Mkt. Litig.*, 2009 WL 340648, at *13 (N.D. Cal. 2009)).  A plaintiff

must also specifically allege that the fraudulent conduct caused its injury.  *In re WellPoint*, 865

F. Supp. 2d at 1048.  And the fraudulent conduct must be an "immediate cause" of injury.

Plaintiffs must allege that, but-for the fraudulent statements, "the plaintiffs in all reasonable

probability would not have engaged in the injury-producing conduct."  *See id.* (citing *In re

Tobacco II,* 46 Cal.4th at 326, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009)).

Here, Hytera meets the heightened pleading standard.  Hytera provides sufficient detail

about the "who, what, when, where, and how" of the allegedly fraudulent conduct.  *See In re

WellPoint*, 865 F. Supp. 2d at 1048.  Hytera identifies the dealers on the receiving-end of

Motorola's false statements and the time when they occurred.  *See* Am. Cplt., at ¶ 152 (Dckt.

No. 45) (Motorola made false statements to two New York dealers in July 2018);  *id.* at ¶ 154

(Motorola's false statements influenced Wisconsin customer in July 2018); *id.* at ¶ 155

(Motorola made false statements to New Hampshire dealer in July 2018).  And Hytera directly

connects at least one injury to Motorola's actions, alleging that it "lost a customer" as a "direct

result" of Motorola's misinformation campaign.  *Id.* at ¶ 154.

Ultimately, Hytera Communications America (West) can bring a UCL claim under

California law.  To the extent any of the other Plaintiffs seek to bring a claim under this law,

39

those claims are dismissed. In sum, Hytera's California UCL state law claims survive the pleadings stage, to the extent they are brought by the California resident – Hytera Communications America (West).

**B.      Florida Claims (Count VI)**

Next, Hytera brings a claim under the Florida Deceptive Trade Practices Act (FDUPTA). As before, Motorola argues that Hytera failed to allege facts sufficient to justify application of this Florida law because there is not a sufficient nexus to Florida.

Plaintiff Hytera America, Inc. has its principal place of business in Florida. *See* Am. Cplt., at ¶ 33 (Dckt. No. 45). As an in-state resident. Plaintiff Hytera America has standing under FDUPTA. *See Ajose v. Interline Brands, Inc.*, 187 F. Supp. 3d 899, 910 (M.D. Tenn. 2016).

While an in-state Florida resident can bring a FDUPTA claim, an out-of-state plaintiff faces a higher burden. And, as Hytera sees it, the alleged conduct "affects the entirety of the relevant market, which constitutes the entire United States, including Florida." *See* Def.'s Reply, at 23 (Dckt. No. 95). That isn't enough for the other Plaintiffs. The out-of-state Plaintiffs need to plead that the wrongful conduct occurred in Florida. *See Molinos Valle Del Cibao, C. Por. A. v. Lama*, 2008 WL 11333544, at *3 (S.D. Fla. 2008) (noting that FDUPTA applies to out-of-state plaintiffs for "unfair, deceptive and/or unconscionable practices which transpired within the territorial boundaries of this state without limitation") (quoting *Millennium Commc'ns & Fulfillment, Inc. v. Office of the Attorney General*, 761 So. 2d 1256, 1262 (Fla. 3d Dist. Ct. App. 2000)). In order to have standing to bring a claim under FDUPTA, an out-of-state plaintiff must allege that there was some connection between the offending conduct and the state of Florida. *See Goodwin v. Am. Equipment Leasing, LLC*, 2012 WL 13102266, at *3 (M.D. Fla. 2012)

(noting that "in order for an out-of-state consumer to have standing to assert a FDUPTA claim they must plead sufficient facts showing a nexus between the offending conduct and the territorial boundaries of the state of Florida").

Apart from one isolated comment, Plaintiffs' complaint lacks any such allegations. *See* Am. Cplt., at ¶ 157 (Dckt. No. 45). Instead, they argue that the allegations that the conduct occurred nationwide is enough. It isn't. *See, e.g.*, *Stein v. Marquis Yachts*, 2015 WL 1288146, at *6 (S.D. Fla. 2015) ("Florida courts have held that FDUPTA does not apply to actions that occurred outside of Florida."); *Coastal Physician Servs. of Broward Cnty., Inc. v. Ortiz*, 764 So.2d 7, 8 (Fla. 4th Dist. Ct. App. 1999) (noting that FDUTPA is "for the protection of in-state consumers"). Thus, while Hytera America, Inc. can bring FDUPTA claims, the other Plaintiffs cannot.

Motorola also argues that because Hytera's claims fail to state a federal antitrust claim, they necessarily also fail to state a claim under FDUPTA. FDUPTA defines "deceptive and unfair practices" to include "violations of '[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.'" *See Cross v. Point & Pay, LLC,* 274 F. Supp. 3d 1289, 1296 (M.D. Fla. 2017) (quoting Fla. Stat. Ann. § 501.203(3)(c)); *see also In re Dealer Mgmt. Sys. Antitrust Litig.,* 362 F. Supp. 3d 477, 498–99 (N.D. Ill. 2019). Some Florida courts refer to FDUPTA claims premised on the violations of other laws proscribing unfair or unlawful practices as *per se* claims, because they are explicitly provided for in the statute. *See Cross*, 275 F. Supp. 3d at 1296; *see also QSGI, Inc. v. IBM Global Financing,* 2012 WL 1150402, at *4 (M.D. Fla. 2012).

Hytera's Sherman Act claims survive. For that reason, its parallel FDUPTA claims survive, too. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d at 498–99.

41

Motorola's motion to dismiss the claim under Florida law is denied as to Hytera America. Any claims under the FDUPTA brought by the remaining Plaintiffs are dismissed.

### C.     New Jersey Claims (Counts VII–VIII)

Motorola's argument against Hytera's New Jersey Antitrust Act state law claims dovetails with the same arguments that Motorola lodges against Hytera's federal antitrust claims. That is, Motorola argues that because Hytera's allegations are insufficient to state a federal Sherman Act claim, they are also insufficient to state a New Jersey state law claim. *See* Def.'s Mem., at 21–22 (Dckt. No. 89).

The New Jersey Antitrust Act has been construed to "prohibit the same conduct forbidden by the federal antitrust laws." *Quality Auto Body, Inc. v. Allstate Ins. Co*., 660 F.2d 1195 (7th Cir. 1981) (quoting *Clairol, Inc. v. Cosmetics Plus*, 130 N.J. Super. 81, 325 A.2d 505 (1974)). Hytera's Sherman Act claims survive. For that reason, Hytera's parallel New Jersey state law claim does, too.

Motorola's motion to dismiss Count VIII is denied.

### IV.     Lanham Act Claim (Count IX)

Finally, Hytera alleges a Lanham Act violation on the same facts. Motorola says that Hytera's allegations fall far short of alleging a Lanham Act claim. In their view, Hytera's claims amount to one-on-one conversations, which courts have found insufficient for a Lanham Act claim due to the statute's "limited scope." *See* Def.'s Mem., at 23 (Dckt. No. 89) (citing *Sanderson*, 415 F.3d at 624).

There are five elements to a Lanham Act false advertising claim.[4] *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999) (citation omitted). Motorola says that Hytera

---

[4] The five elements of a Lanham Act claim: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has

can't even get past the first element, which requires the allegedly false statement to be "in commercial advertising or promotion." *See* 15 U.S.C. § 1125(a)(1)(B); *Neuros Co. v. KTurbo*, *Inc.*, 698 F.3d 514, 521 (7th Cir. 2012); *see also* Def.'s Mem., at 23 (Dckt. No. 89). Motorola asks this Court to dismiss Hytera's Lanham Act claim because Hytera fails to allege that any of these alleged misrepresentations constitute advertising or promotion. *See* 15 U.S.C. § 1125(a)(1)(B); *see also* Def.'s Mem., at 23 (Dckt. No. 89).

In *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620 (7th Cir. 2005), the Seventh Circuit held that three person-to-person communications at trade shows did not constitute commercial advertising or promotion. *Id.* at 624; *see also Neuros*, 698 F.3d at 521. The Court of Appeals has similarly held that letters sent to business partners that falsely represented patent rights don't constitute commercial advertising or promotion, either. *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 316 F.3d 731, 733 (7th Cir. 2003).

At the same time, to allege that the misrepresentation occurred in "commercial advertising or promotion," the misrepresentation doesn't need to be in "published or broadcast materials." *See Neuros*, 698 F.3d at 521–22 (citations omitted). And the misrepresentation need not be directed to the general public. *Id.* at 523. Instead, the specifics of an industry can dictate the relevant promotional scheme. *Id.* at 522. "[T]here are industries in which promotion – a

the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999) (citing *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999)).

systematic communicative endeavor to persuade possible customers to buy the seller's product – takes a form other than publishing or broadcasting." *Id.*

Hytera alleges that Motorola undertook a misinformation campaign that misrepresented the ITC ALJ's decision, saying that it barred sales of *all* Hytera products. Hytera says that's false. *See* Am. Cplt., at ¶ 142 (Dckt. No. 45). Motorola also allegedly told dealers that Hytera's products are "unreliable;" that Hytera was "not permitted to sell any products in the United States;" and made xenophobic remarks to "sow fear, doubt, and uncertainty." *Id.* at ¶¶ 148–58. Hytera also alleges that Motorola (may have) attempted to sabotage Hytera by complaining to the FCC that Hytera was "operating unlicensed radios" at an industry trade show. *Id.* at ¶ 162. The FCC later investigated, and determined that the Hytera products were compliant with licensing requirements. *Id.*

These allegations don't rise to the level of commercial advertising or promotion. Hytera fails to allege that these statements went beyond person-to-person communication. True, Hytera alleges that the dealers in the industry are often the ones promoting the product, and Motorola allegedly made false statements to the dealers that the dealers turned around and repeated to the customers. As Hytera sees it, this "rebroadcasting" is more effective than general advertising "because the dealers' purported independence adds a veneer of credibility to the false statements." *See* Def.'s Reply, at 21 (Dckt. No. 95).

But the allegations, on their face, still only amount to person-to-person statements. These person-to-person comments aren't advertising. *See, e.g.*, *First Health Grp. Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803–04 (noting that "a person-to-person pitch by an account executive" is not advertising); *Control Sols., LLC v. Oshkosh Corp.,* 2011 WL 1131329, at *4 (N.D. Ill. 2011) (dismissing a single allegation of "person-to-person contact" in a sales pitch);

*Chicago Consulting Actuaries, LLC v. Scrol,* 2005 WL 819555, at *3 (N.D. Ill. 2005) (dismissing two "face-to-face meetings and personal sales calls").

While these statements cannot be construed as advertising, there is also the question of whether they amount to promotion. The Seventh Circuit has explained that a Lanham Act violation can go beyond advertising. *See Neuros*, 698 F.3d at 522. Indeed, the Lanham Act language explicitly includes advertising *or promotion*. *See* 15 U.S.C. § 1125(a)(1)(B); *see also Neuros*, 698 F.3d at 522. As the *Neuros* court explained, promotion – "a systematic communicative endeavor to persuade possible customers to buy the seller's product" – can take a form other than publishing or broadcasting. *Neuros*, 698 F.3d at 522.

In *Neuros*, the defendant presented its slide deck (trashing its competitor) at a road show that reached "most of the engineering companies" in the relevant industry. *Id.* The false statements were also posted on defendant's website. *Id.* While that is not necessarily advertising in the traditional sense, the Court found that the false statements reached the relevant customers and was sufficient to state a Lanham Act claim.

But here, there is no such allegation of widespread promotion. At most, Hytera alleges that a handful of Motorola representatives made false statements to a handful of dealers. *See* Am. Cplt., at ¶¶ 148–57 (Dckt. No. 45). These allegations are more like the three person-to-person statements in *Sanderson* than the widespread promotional activity alleged in *Neuros*. *See Sanderson*, 415 F.3d at 624. The three person-to-person false statements didn't constitute advertising or promotion in *Sanderson*. *Id.* Motorola's person-to-person misrepresentations to its dealers don't, either.

Motorola's motion to dismiss Count IX is granted.

**Conclusion**

Motorola's motion to dismiss Count V is granted against all Plaintiffs other than Hytera Communications America (West). Motorola's motion to dismiss Count VI is granted against all Plaintiffs except Hytera America, Inc. Motorola's motion to dismiss Count IX is granted against all Plaintiffs. For all other counts, Motorola's motion to dismiss is denied.

Date: August 24, 2022

Steven C. Seeger
United States District Judge